Good afternoon, and may it please the Court, my name is Mac Lacy, and I appear on behalf of the appellant, Oregon Natural Desert Association. With me at council table is David Becker. I will be addressing ONDA's NEPA appeal on the merits, the 08-35942 matter. And then after that, Mr. Becker will respond concerning the intervention issues in the related appeal, the 08-36041 matter. So I will take ten minutes according to the agreement among council, and Mr. Becker then will take the other ten of ONDA's minutes. Who developed all the acronyms? The acronyms. Yes, I should explain that ONDA is how I pronounce the acronym for the appellant group. See, here's a list of the acronyms. And one of them is amel. The other one is scampa. The other is geese. The other is feese. The other is flippa. The other is onda. The other is ora. The other is scampa. That's spelled a little different than the second one. And the next one is smud. Do you think you could get all those in one sentence? As a law student studying environmental law, I quickly learned that it was about a lot of acronyms. Yeah, but think of the poor reader. One time I had a sentence that at least had I think about eight acronyms in it. It saved a lot of time. It does save time. It also gets your head spinning. Gets you to sleep by the time you get to the seventh one. I'll see how many acronyms I can work into my presentation this afternoon. I think the point is not to use them, okay? I'll try to be clear. Thank you. This case is about how BLM deals with information under NEPA, and specifically its obligation in the service of informed agency decision-making and meaningful public participation to disclose and discuss in the EIS responsible opposing views and information. The Onda Wilderness Report comprehensively documented more than a half million acres of public lands with statutorily defined wilderness characteristics. It directly challenged BLM's baseline assumption that there were a mere 6,500 acres of such lands within this planning area out by Steens Mountain in southeast Oregon. But, counsel, isn't your problem not that the government failed to consider this report, but that the government did not agree? And how is that a violation of NEPA if the government considers the report, but just comes to a different alternative? This case is about the answer to the first question. Is your argument not that the government didn't review it, but that it didn't agree? That's right, Your Honor. And the heart of the case is subsection 1502.9 of NEPA, and that's where the requirement to disclose and discuss information comes from. Your basic complaint is that they put the entire discussion of your 24 recommended areas and did it in one paragraph, basically, and really only thoroughly discussed the one that they accepted plus three others they found, and then didn't in detail discuss your other 23 suggestions. Because, you know, assuming we were to find that they adequately considered, and I think there's plenty of evidence in the record of what they did as a team, the real problem is they didn't discuss the 23. But I'm just wondering where is it required that they discuss in detail each of the 23 rejected when they obviously accepted one that you proposed? And what kind of relief do you want? Would you tell them to go back and, you know, do a new report that explains why they rejected all of the 23? Is that what you want? Well, yes. The requirement comes from the subsection I just referenced. But it doesn't really. Okay. So the requirement is adequate, has to adequately discuss it. Well, what does that mean in this context? Well, the leading case is Center for Biological Diversity versus Forest Service, this Court's case from 2003. And that case, along with the Navajo Nation case, are the two cases that explore what exactly is required by 1502.9a and b. And in that case, the Court explained that the question to ask is whether the information, in this case the ONDA report, directly challenges the scientific basis upon which the final EIS rests and which is central to it. If so, then the disclosure has to happen in the EIS itself, and the critical discussion of the information has to happen in the EIS itself. And the reason that's important is because process matters under NEPA. And as this Court explained two years ago in ONDA v. BLM, the 2008 case dealing with wilderness issues, the process that the agency goes through in following the NEPA regulations in terms of public participation and disclosure of information, NEPA is only a procedural statute for sure, but going through the proper procedures almost certainly affects the substance of the decision. And that's what's important here. And to get back to the second part of your question, Judge Wardlaw, what did ONDA want BLM to do if not what happened in this case? The disclosure of the information needed to be substantive. When you look at the single paragraph in the EIS at ER 2385, essentially we have a statement that proposed WSA information was received, a team was formed, a protocol was developed, and then nothing else beyond that, aside from the fact that one of these WSA proposals was agreed with and the rest presumably were rejected, although even that's not explicitly stated in the paragraph. But there's no substantive disclosure of what the information was. But you wanted the scientists from the government to completely refute each and every assertion that a road had been overgrown or that the road wasn't used. That's a tall order in terms of what NEPA requires, don't you think? Well, I don't think so, Your Honor, because the concept of what constitutes a wilderness is defined under statute. It comes out of the Wilderness Act, and the threshold element is roadlessness, and yes, this issue of a road versus a way. If ONDA had just sent in a letter during the NEPA period and said, we think there are other areas out there that have wilderness character, and we want you to look at it, BLM would have an obligation to disclose that opposing view and to respond to it. But I think that the agency's obligation, there would be a lower threshold there. What happened here was that ONDA submitted a 1,600-page report, and I will emphasize that ONDA used BLM's own inventory handbook, the 2001 Wilderness Inventory Handbook, which, of course, was based on the agency's own 1978 handbook. So the definitions of these terms are long established, going back to the Wilderness Act itself and then these handbooks, and even the methodology and protocol that the agency uses to identify wilderness character lands is well established, and ONDA used those methodologies and put the information out there. Once BLM had the information in its hands, to the extent it didn't agree with the presence of certain roadless areas, to the extent it didn't agree with road versus way determinations, then it had some affirmative substantive obligation to explain that it disagreed and why it disagreed and, under NEPA, what evidence the agency had to rebut 1,600 pages of evidence that points exactly the opposite direction from the baseline assumption in the EIS, and that's what we learned from the Center for Biological Diversity case and from the Navajo Nation case. In the Center for Biological Diversity case, for example, this court rejected the agency's reliance on an alternative that discussed some of the critical comments about goshawk habitat. This court rejected direct letter responses to the commenters who had brought up the opposing views. This court rejected the fact that agency intra-office memos were in the administrative record saying, no, the obligation to disclose and discuss is an obligation that goes to, that must be fulfilled in the EIS itself, and just like that case, Your Honor, the substantive and critical examination of the information was required to be in the EIS itself. The LM may have had some of those. In those other cases, was there any information in the EIS or was all of it outside the environmental statement? There was some. In the Center for Biological Diversity case, the agency included an appendix in the EIS of responses to comment section, and in that appendix, there was some partial response, as the court described it in the opinion, to the concerns about goshawk habitat. So under that case, the facts were even better for the agency than they were here, where there's nothing in the EIS except for the single paragraph that the government relies on. I'm just struggling with how much we can dictate that the agency has to say, because I mean at some point it becomes ludicrous for the agency to have to kill more trees to save trees. So in a manner of speaking. And that's the part I'm struggling with is how do we say when enough is enough or when the agency has fulfilled its obligation and not impose, you know, an impossible or impractical requirement on the agency. That's what I'm struggling with. Well, I think I would answer your concern in two ways, Your Honor. One, going back to the description of what 1502.9 means in the Center for Biological Diversity opinion. Well, it's adequate. And then adequacy isn't, you know, that's the part I'm struggling with. What is adequate? I mean, is it measured by the, you know, the amount of text that's in the objectors? And then does the objector then control the content of the environmental impact statement or is it something less? Well, at a minimum it has to be something substantive. And here we have vague statements. Information was received. A protocol was developed. A team was formed. But there's nothing substantive there. And the reason that's important is there is nothing for the public to review and critique. And in the administrative record in front of the trial court, ONDA submitted a declaration from its GIS analyst, Craig Miller, that's at ER 107. And in that declaration, Mr. Miller went through the internal evaluation forms that BLM had prepared and put into the administrative record. And Mr. Miller went through a couple examples of if we had had this information during the NEPA process, here are the types of concerns we would have leveled at BLM. Here are the types of roadway concerns and evidentiary concerns that we would have brought to BLM's attention and requested the agency to respond to. And that's what it comes down to for NEPA, is providing a meaningful way for the public to substantively review and critique the agency's work. And then bringing it back to this court's job, this court has to take a sufficient depth of review looking at the EIS itself, based on the requirements of 1502.9, but then delving into the record itself and BLM's evaluation forms weighed against the ONDA report and ask itself, is there enough information so that we can say that in the EIS, the conclusion that BLM reached, which is a polar opposite from the baseline that ONDA presented, is BLM's conclusion rationally tied to the facts and the data that it purports to interpret? Now, we have cases that say even if the agency's articulation is less than perfect, if we can discern the path of reasoning, that's adequate for NEPA. Why doesn't that defeat your argument in this case? Because, again, if you look at the single paragraph at ER 2385, there's nothing in that paragraph alone for a citizen to read and say, oh, I understand why the agency didn't agree here. If we as a court can discern the reasoning under NEPA, you fail. So why doesn't that defeat your argument if we as a court can discern that the agency looked at all of the information that was supplied by ONDA and except for one area determined that it wasn't sufficient to change the plan? Well, as an initial matter, you as the court have to be able to make that determination based on the EIS itself. That's settled law under 1502.9. And the Center for Biological Diversity case, the Navajo Nation case, even the more recent Lands Council case, which touches on this issue, all are very clear that the explanation has to be in the EIS itself. Well, we have to be able to discern that the agency looked at the information and didn't and the agency was not persuaded that the areas were roadless or, you know, that the roads had overgrown or had not been used. Why isn't that sufficient to defeat your claim under NEPA? Because you also have to be able to discern that the public was given a meaningful opportunity to see the evidentiary basis for BLM's work and for its conclusions and to comment on it. Because in the end, that's what NEPA is all about, providing a chance for the public to participate and provide meaningful comment. And that can only happen if there's a substantive disclosure and discussion in the EIS. I have gone over the time I intended to reserve, so I'd like to reserve ONDA's remaining time for Mr. Becker unless there are further questions. Thank you. May it please the Court, I am David Shulton. I'm representing the Bureau of Land Management, and so I will respond on the NEPA question for ten minutes. Well, the obvious question, I mean, how does this one paragraph at ER 2385 meet the full and fair discussion requirement? I think it does, Your Honor. The question here is How does it? I mean, it doesn't discuss the other 23 parcels at all. It tells why BLM accepted the one parcel, so it explains the criteria, naturalness, and opportunity for primitive recreation or solitude. It doesn't explain the reasons for disagreeing with ONDA on the other, but I don't think that's necessary in a NEPA document which is on a plan which covers all manner of resources, not just wilderness characteristics. We're talking here basically about the environmental baseline and whether the discussion in the EIS of environmental baseline is sufficient. Well, is there additional discussion that I should be looking at on this issue other than what's at ER 2385-6? In the EIS itself, the final EIS, there is discussion on the one area that was found to be have wilderness characteristics in terms of impacts, but there's no further discussion. Right. There's no discussion. So there's no discussion at all anywhere in this record. That's part of what you're required to, where you're required to discuss it. Of the 23, you know, I know your team rejected the other 23. Right. I can probably infer it rejected it because it didn't view those areas to have changed so significantly that they were now roadless and had more of the characteristics of wilderness. But I can't find that expressly. No, it's not in the final EIS. It's in the record of the management plan. There's all 100 pages worth of evaluation sheets that show what the team did and the reasons why they decided against the proposal. But it doesn't need to be in the final EIS because the discussion in an EIS at the environmental baseline is supposed to be succinct according to the CEQ guidelines. That's 40 CFR 1502.15. The requirement is full and fair discussion. It's not succinct or concise. Well, EISs are supposed to be analytical to analyze the environmental impacts and to focus on impacts and alternatives. This is about what's out there, what's the environmental baseline. And so the CEQ regulations indicate that the discussion of environmental baseline is supposed to be succinct. It's not supposed to be encyclopedic. There was a lot of concern that EISs were getting just too bulky and too descriptive and not analytical enough. And so the CEQ regulations say that when you're describing environmental baseline, you can do that succinctly and save your pages for the real analysis of impacts and alternatives because that's what really counts for making the final agency decision. And so that's where BLM focused here was the impacts of the resource management plan on the various resources. And there's no complaint about that from ONDA. The only complaint here is that this final EIS didn't explain all of the reasons for not accepting the other 23 proposals. But there's really no case law that says that when the agency has made a land classification decision like that, that it has to describe in the EIS all of the reasons why it made its classification decisions. And I think the reasons for that are evident. This resource management plan describes over a dozen different types of resources that require classification decisions. There are things like visual resource inventories, cultural resource inventories, that require the agency to make these sorts of initial classification decisions. And if you required that the final EIS contain discussions of how it made those decisions, I think the EIS would become useless by just covering too much material. So, again, this EIS is focused on the critical issues, which are the impacts and the alternatives. This case is very different than Center for Biological Diversity versus U.S. Forest Service, the chief case relied upon by the appellants. There, that EIS was for a management plan for a specific species, the goshawk. And it relied on a particular scientific premise that the goshawk is a habitat generalist, can survive in a lot of different types of habitat. Well, there were scientific studies out there. There were opinions from both the state and the federal wildlife agency saying no. The goshawk, in fact, is a habitat specialist, requires a very specialized habitat. And the final EIS didn't say anything to refute those. Those comments went to a central scientific premise of what the agency was doing that was critical to the agency decision, and the agency didn't deal with it, and that was a violation of NEPA. This is just not like that at all. Here, the EIS covers the important issues about what's out there on the environment. It describes the congressionally designated wilderness, the wilderness study areas, and it describes the areas that it had found to have wilderness characteristics, one that had been suggested by ONDA and then three that it found itself. And then it describes the impacts and alternatives. And that suffices to fulfill the purposes of NEPA. This case, of course, is also not like the ONDA versus BLM case that this court decided in 2008. That involved a resource management plan in EIS that were completed about three years before this one. And unfortunately, in that one, the agency had taken the position that assessment of wilderness characteristics was a one-time responsibility that was completed back when it prepared the material to submit to Congress in 1991. That position was incorrect. In this case, the agency didn't take that position. It looked at all of ONDA's materials. It assessed them carefully, decided that it agreed with one. But that process, as the district court understood, is basically a process that is carried out under the Federal Land Policy Management Act, FLPMA, that requires the agency to keep inventories of the land and what's out there on the land. And so the agency used its normal FLPMA processes for doing that. It brought together the interdisciplinary team and resolved those matters. The district court correctly understood that you can't import that FLPMA material just wholesale into an EIS, or the EIS will become, again, unworkable. So we think that the discussion in the EIS was adequate on that. And I would also point to those parts of the EIS that talk about the impacts on wilderness area. And you see for each alternative, they talk about possible impacts on wilderness characteristics. The other issue that has been raised in the briefs is alternatives with respect to off-road vehicles. It hasn't been discussed here today, but I'd be happy to talk about that issue if the court has questions about the off-road vehicle issue, which, again, I think is very distinguishable from the case in ONDA versus BLM, where the agency had not considered any alternative that closed large areas. This one considers an alternative, alternative B, that closes large areas and is focused on wilderness areas. So I think overall, this EIS fulfills the rule of reason as far as describing the environment and discussing the impacts on wilderness areas. What was the code section or regulation that you cited that had the succinct language? It is 40 CFR 1502.15. Okay. Thank you, Your Honor. If the court would indulge me, I'd like to take just one more minute of ONDA's time on rebuttal, but that's what I would request. Well, you know, actually, I'm just wondering if two things, whether the whole debate over the intervention motion is worth ten minutes. It could be asking us to rule against well-established Ninth Circuit law, which we certainly can't as a three-judge panel. So if your friend will give you the time, I think it should be okay. Yeah, because we want him to be able to put his resume that he argued before the Ninth Circuit. That's right, Your Honor. I did go over. I will just take one minute so that Mr. Becker has two and a half. He just threw himself on his own sword. And Mr. Becker will also explain that we don't think that we need a full ten minutes to respond on that issue, but I will leave that to him. The one point I wanted to make in a minute here is the concern that Judge Wardlaw and Judge Rawlinson brought forward when I first presented was what's enough, where do we draw the line in terms of what ONDA wants to see out of the BLM and how far does the disclose and discuss obligation go. And under the – there may be facts in a case where a plaintiff is asking for too much over a trivial issue, but that's not the case on the facts before the Court here. And referring to the regulation that you asked about, Judge Wardlaw, just at the closing of my colleague's argument, 40 CFR 1502.15, it says that the data and analyses in a statement shall be commensurate with the importance of the impact. And this Court explained two years ago in ONDA BLM that wilderness is an issue that, in that Court's words, is one that's likely to be vigorously debated, the presence or absence of wilderness values in the public land and how those should be managed. And as a practical matter, wilderness is a finite resource. It's a fragile resource. Once it's gone, it's gone and it can't be recovered. And so this is a resource that I think under the MEPA regulations, under this Court's case law, is a resource that can't be relegated to just a paragraph. What do you do with the language in Navajo Nation that says, the agency need not set forth at full length the views with which it disagrees? What do you do with that language? Well, the Court in Navajo Nation explained that all of the things that the agency did do in that EIS, the agency included quite a lengthy discussion of the scientific concerns, the government's own concerns about the issues, endocrine-disrupting chemicals. It included citations to published and unpublished studies. It included a table of data from research the government had done on measuring levels of these endocrine-disrupting chemicals and the type of treated effluent water that was issued in that case. So are you saying that language is gifted? I'm saying that under the facts of that case, that the agency, the Forest Service in that case, put a lot of critical discussion and disclosure of the information that was at issue into the EIS itself, and that was enough, and that's a far different factual case than we have before us. But what about the information that's there, not, I mean, admittedly not in the EIS, but it's information that the evaluation forms and discussion, why isn't that enough to help us discern the reasoning of the agency? Well, all of the information I just listed in Navajo Nation was in the EIS itself. But if it's somewhere else and we can look at it and discern the reasoning of the agency, why is that a violation of NEPA? This Court can look at it after the fact, but NEPA requires that the information be disclosed and discussed in the EIS  So if the appendix is part, if the appendix is attached to the EIS, is it your argument that because it's not in the EIS itself, that deprives the public of the opportunity to know what actions the agency took? That's what this Court held in Center for Biological Diversity. In that case, there was some of the response in an appendix, in the responses to comments section, and this Court said that wasn't good enough. It has to be in the text of the EIS itself. But, of course, that didn't happen in this case. It wasn't even in an appendix. It was only something that came out in the record after the fact. And I have reached my limit, and out of respect to my colleague, I'll rest my argument unless there are further questions. Thank you. Thank you. Is your colleague going to say something? Oh, she has. Okay. All right. Good afternoon. May it please the Court, my name is Elizabeth Howard, and I'm here on behalf of the Steens Mountain Landowner Group, and I'm here to address the intervention issue. Specifically, I want to address District Court Judge Aiken's decision denying the Steens Mountain Landowner Group both permissive intervention and intervention as of right, which is? Well, let me just ask you, if we ruled that our final environmental impact statement adequately discussed on this suggestion, isn't your appeal moot? Your Honor, no, I do not believe so. There is a case law in the circuit, and we didn't specifically brief it here because it wasn't an issue raised, but there is case law that clearly says that the intervention issue can be separately appealed and decided by the circuit. But that's not the question. The question is, is it moot? What could come of an appeal that would make a difference? In other words, is it redressable? I apologize. Or if we were to affirm the RMP, what type of relief would you be seeking if you were intervening? Right, Your Honor. In that situation, no, I think you're correct that that issue. That would be the situation, right? Right. Yes. All right. And then alternatively, the District Court denied your motion to intervene, citing well-established Ninth Circuit law, saying that only federal agencies can intervene. The private parties seeking to advance their economic interests, such as yourselves, cannot. And so you're really asking us to do something we cannot do, which is overrule established Ninth Circuit precedent. Your Honor, I'd like to make two responses to that. First of all, we also applied for permissive intervention, and the District Court judge denied that on the basis of the none-but-the-federal-defendant rule, which is what you're referring to. And the case law in this circuit is very clear that permissive intervention cannot be determined based upon the none-but-the-federal-defendant rule. The Kootenai Tribes v. Venneman case specifically states that that issue does not come into play when you're looking at permissive intervention. The only thing that a party needs to do is provide a common defense, and that's a common question of law or fact. And in that case, it was a common defense. They didn't even have to assert specific affirmative defenses. They just had to simply show that they would respond to the claims that were being made. Well, what's your common defense to claim that BLM violated NEPA? Well, there were other claims at issue in this case beyond just NEPA. There were, I think, four or five. One of them was that BLM violated NEPA. The other one was that BLM violated NEPA. And the appeal is the FBIS and the two issues concerning the disclosure and the ORVs. And, Your Honor, District Court Judge Aiken did not even reach that issue. She and the Kootenai Tribes case is very clear that all you have to do is respond. I still don't understand what you want by intervening. Well, Your Honor, in this case, there were decisions that were being made that would affect my client's ability to grace and ability to have federal access. I'm sorry. But wasn't your client given the opportunity to intervene at the remedy stage? Yes, Your Honor. Those issues could have been addressed at the remedy stage. Well, not very well, Your Honor, because at that point, if the remedy is injunctive relief, part of the issue in injunctive relief is whether or not the plaintiff will prevail on the merits. And by the time we get to the remedy phase, that issue has already been decided. And so while we're granted the ability to intervene in the remedy phase, we effectively don't get to argue one of the key elements of remedy. And what we're looking for here to answer your question is for this panel to ask for an en banc review of this decision and, I'm sorry, of this rule. And part of the reason for that, key reason, I think, is because the circuit has conflicting opinions. The County of Fresno case, which we talk about in our briefs, is very clear that in circumstances such as ours, where we were going to be impacted by the underlying subject matter of the case, which in this case was the resource management plan, that we would have been allowed intervener status even though that was a, this is a NEPA action or there was a NEPA action involved. The County of Fresno case was a NEPA case. And the parties were wanting to be interveners in that case. I know you're asking us to do a lot of work for you without giving us a very good reason. Well, I mean, suppose we roll against you. Can't you move for a hearing en banc? Your Honor, yes, we can. And so maybe that should be something your client should pay for instead of us taking on ourselves. Actually, it's more work for you, so you should be. I just probably won't. Couldn't the district court also deny the motion for permissive intervention because the court felt there was no independent basis for jurisdiction? Your Honor, I think that part of the decision is a bit unclear. But, yes, that's what I understood her to say. And the court did not address the fact that supplemental jurisdiction, I'm sorry, that that requirement has been subsumed by the fact that supplemental jurisdiction applies. Supplemental jurisdiction is an independent jurisdiction. By definition, it's supplementary to jurisdiction, the main source of jurisdiction. So supplemental jurisdiction doesn't help you in terms of independent jurisdiction. So if that's all you have in terms of independent jurisdiction, the district court decision should be affirmed on that basis. As I understood the rule, the fact that we were asserting common defenses and claims and that our issues were closely aligned with the issues in the case, that would cover supplemental jurisdiction would bring us into the case. What case is that? Your Honor, I'm sorry. I'll have to refer back to my briefs. I believe we talked about a case, I believe it was out of the District of Illinois, and it frankly was one of the only cases that actually addressed that issue on point. I would point out that the Kootenai Tribes case didn't even come to that issue. And I think, again, because they were saying the issue here is whether or not there's a common question of law or fact. And they found that because the party was going to simply respond to the claims that were being asserted, that was sufficient. The problem is if a case doesn't have a considered discussion of an issue, it's not, you know, considered a case that we have to follow, because if neither party brings the issue up and it's not resolved, then we're free to resolve the issue. And that's what it sounds like. You're arguing that by implication that issue was decided, but that's not precedent for us. Well, and unfortunately, I don't think there's a case directly on point in the circuit on that issue. I thought Northwest Forest Council v. Glickman said that a supplemental jurisdiction is not an independent basis of jurisdiction. Your Honor, that may be true, and I'm sorry, I'm not prepared to respond to that particular case. All right. All right. Well, I would just like to summarize that we were denied intervention both on permissive intervention standards and on intervention as a right. One other issue, I guess before I finalize my comments, is on the protected interest issue. And the federal rule talks about having a significantly protected interest, and one of the specific issues that we were very concerned with in the decision was the determination that grazing And I think that's very clearly wrong based on the Sierra Club v. United States of EPA case, which specifically says that a protected interest can be found not only, it doesn't have to be found based upon the laws that are at issue in the case. It can be based on any law. And grazing permits clearly are protected. They're a function of federal law. They're also protected by rules and regulations that ensure that they can't be restricted without due process. And there are a series of cases and regulations that deal with that, so that was also an issue that we wanted to make sure to bring to this Court's attention. One other issue that I just want to mention or concern was that the way that this case was applied, again, it was applied to all of the claims, not just to the NEPA claim. And so I wanted to make sure the Court understood that that seems to be somewhat unprecedented as I read the Ninth Circuit case law, is that the none but the federal defendant rule was applied not only to deny intervention on the NEPA claim, but on every other claim that was brought in this case, including claims based upon the SEANS Act, which was an act in which my clients were integrated. Do you want a whole new trial on this or a whole new hearing on this? Your Honor, we asserted specific claims, including standing, that we would have advanced if we were allowed to be involved. And all that's on appeal is NEPA. I realize that, Your Honor. The problem is that this particular rule prevents my clients and people in the same situation from being able to be involved in cases that have a direct impact on them, that have a practical impact. That's the reason why we keep on coming, is because there is a practical impact on my clients. They are affected by delay that's caused when we have to do more wilderness inventorying. They're affected by the relief that's requested in these cases. My clients sat at the table, exchanged lands, and were intimately involved in the SEANS Act. And that case, that very statute was at issue here, and my clients were denied the opportunity to be involved in talking about how it would impact them. And that is fundamentally, I think, unfair and inconsistent with what the intervention rule is all about. Thank you. Thank you. Your Honors, and may it please the Court, David Becker for the Oregon Natural Desert Association is appealee. At this point, we don't have any time remaining, but I would be happy to answer any questions the panel may have. If not, we'll rest on the brief we've submitted. Thank you very much. I want to make sure you can hear. Hi, Mr. Boyle. Can you hear everybody? Can you hear me? Mr. Boyle? Yes, I'm here. Okay. Can you hear me? Yes. Okay, great. Thank you. We're going to be starting. Okay.
judges: Pregerson, Wardlaw, Rawlinson